IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
UNITED STATES OF AMERICA,        *
STATE OF CALIFORNIA ex rel.      *
DIXIE SWITZER, as Executor to    *
the Estate of Ted Switzer, and   *
DIXIE SWITZER,                   *
                                 *
        Plaintiffs,              *
                                 *
        v.                       *          CV 123-158
                                 *
ROBERT C. WOOD, II; ACCESS       *
MEDICAL, LLC; THOMAS             *
PARFENCHUCK, M.D.; GREGORY       *
OETTING, M.D.; AUGUSTA SPINAL    *
ASSOCIATES, LLC; and             *
UNIVERSITY HEALTH SERVICES,      *
INC.,                            *
                                 *
        Defendants.              *
```

------------

## O R D E R

------------

Before the Court are Defendants Augusta Spinal Associates, LLC, Gregory Oetting, and Thomas Parfenchuck's (collectively, the "Augusta Spinal Defendants") motion to dismiss (Doc. 175) and Defendant University Health Services, Inc.'s ("UHS") motion to dismiss (Doc. 176). For the following reasons, the Court finds the pleadings fall short of Federal Rule of Civil Procedure 9's particularity requirements, Plaintiffs will be given one opportunity to amend, and the Augusta Spinal Defendants' and UHS's motions to dismiss are **DENIED AS MOOT**.

## I. BACKGROUND

Plaintiffs Dixie Switzer ("Ms. Switzer") and Estate of Ted Switzer[1] (collectively, the "Relators") bring this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733. (Doc. 173, at 3–4.) The Court begins by summarizing the procedural history of this action then outlines the relevant factual premises of Relators' claims.

### A. Procedural Background

On September 19, 2018, Relators initiated this *qui tam* suit in the United States District Court for the Central District of California on behalf of the United States of America and the State of California, alleging healthcare fraud schemes in violation of the FCA. (Doc. 1, at 1, 6–13.) Relators brought suit under the FCA against Defendants (1) Robert C. Wood II; (2) Access Medical, LLC; (3) Sean Early and Michael Maguire; (4) the Timberline Group, LLC; (5) Thomas Parfenchuck and Gregory Oetting; (6) Augusta Spinal Associates, LLC and University Health Services, Inc. (collectively with Defendants Parfenchuck and Oetting, the "Georgia Defendants"); (7) Archie Perry and Thomas Dunn; and (8) APSW, LLC, TDSW, LLC, and Kainalu, LLC (collectively with Defendants Perry and Dunn, the "Nevada Defendants"). (Id. at 1, 5–6.) On September

---

[1] Ted Switzer ("Mr. Switzer") died on January 30, 2023. (Doc. 97, at 3.) His spouse and executor of his estate, Ms. Switzer, was substituted as relator for Mr. Switzer on May 16, 2023. (Doc. 104, at 1.)

30, 2021, the Department of Justice declined to intervene. (Doc. 26.) Thereafter, the State of California and the California Department of Insurance also declined to intervene, and the case was unsealed and reinstated. (Docs. 28, 31, 35, 37.)

On May 16, 2023, the Central District of California granted the Georgia Defendants and Nevada Defendants' motion to sever the claims against them and transfer them to the Southern District of Georgia and the District of Nevada, respectively. (Doc. 105, at 11.) On October 17, 2023, the Georgia Defendants' claims were transferred to this Court. (Doc. 149.) After the transfer, Relators filed an amended complaint (the "Complaint") on December 19, 2023, seeking relief under the FCA against the Augusta Spinal Defendants, UHS, Defendant Robert C. Wood, II, and Defendant Access Medical. (Doc. 173, at 26-28.) In response, the Augusta Spinal Defendants and UHS (collectively, the "Moving Defendants") both filed motions to dismiss. (Docs. 175, 176.)

## B. Factual Background

Relators allege the following facts. Mr. Switzer was previously involved in medical equipment sales and distribution, including a business relationship with Defendant Wood. (Doc. 173, at 5, 12-13.) At that time, Mr. Switzer and Defendant Wood met to discuss forming a physician-owner distributorship ("POD") with Defendant Parfenchuck, an orthopedic surgeon in Augusta, Georgia. (Id. at 6, 12.) Over the course of discussion with Defendant

3

Parfenchuck, Mr. Switzer and Defendant Wood's business relationship ended, but Defendant Wood continued discussing creating a POD with Defendant Parfenchuck and Defendant Oetting, another orthopedic surgeon in Augusta. (Id. at 6, 13.) Ultimately, Defendant Wood and his entities, including Defendant Access Medical, LLC, set up an illicit kickback arrangement with Defendants Parfenchuck and Oetting. (Id. at 13.) From 2011 through at least early-2020, Defendant Wood, through his entities, paid illegal kickbacks to Defendants Parfenchuck and Oetting to use spinal equipment and devices supplied by Defendant Wood in hundreds of surgeries or procedures performed at University Hospital, a hospital managed by UHS. (Id. at 6, 13.) The kickback payments were characterized as "consulting fees" and/or "distributions" to disguise the nature of the arrangement. (Id. at 13.)

From November 2011 to January 2015, the kickback scheme was initially perpetrated in the form of a sham consulting arrangement (the "Consulting Arrangement") between Aramat Group, one of Defendant Wood's entities, and Defendants Parfenchuck and Oetting. (Id. at 14.) Pursuant to the Consulting Agreement, Defendants Parfenchuck and Oetting were to devote approximately forty to fifty hours per month performing consulting services, including: reviewing, assessing, analyzing, and testing medical devices; identifying, developing, and consulting with Aramat on potential

4

medical devices and instruments; participating and assisting with Aramat's projects relating to identifying which devices and instruments to include; and visiting device and instrument manufacturers to attend on-site demonstrations, presentations, and trainings. (Id. at 16.) Under the Consulting Agreement, Defendants Parfenchuck and Oetting were compensated $30,000 per month for their services, and payments, which were made by Defendant Access Medical and not Aramat Group, were made out to Defendant Augusta Spinal Associates, LLC, a Georgia limited liability company owned by Defendants Parfenchuck and Oetting. (Id. at 6, 14-15.) Defendant Augusta Spinal was the same entity supplying spinal equipment and devices to University Hospital for surgeries performed by Defendants Parfenchuck and Oetting. (Id. at 15-16.)

Defendants Parfenchuck and Oetting did not provide any legitimate consulting services, or at best performed a de minimis amount of work, to justify the sums they were paid under the Consulting Agreement. (Id. at 16.) Rather, the consulting work consisted of nothing more than controlling inventory, making sure product lines got stocked, evaluating products, and seeing what products worked and which did not. (Id.) Ultimately, Defendants Parfenchuck and Oetting helped facilitate the sale of Defendant Access Medical and/or Alpine Surgical equipment and devices to

5

University Hospital. (Id. at 17.)  The fair value of any purported
"consulting" done by Defendants Parfenchuck and Oetting for Aramat
was well below the $30,000 per month they were compensated, and
the payments were actually kickbacks intended to induce Defendants
Parfenchuck and Oetting to refer business to Defendant Wood's
entities that distributed spinal equipment and devices.  (Id.)

 Around the middle of 2013, Defendant Wood began paying monthly
"distributions" to Defendant Augusta Spinal in addition to the
monthly consulting fees.  (Id.)  Relators represent the term
"distribution" traditionally describes a percentage of profit.
(Id.)  Defendants Parfenchuck and Oetting, thus, either entered a
formal POD with Defendant Wood or a scheme amounting to the
functional equivalent of a POD whereby Defendants Parfenchuck and
Oetting received payments proportional to the profit generated by
their referrals.  (Id.)  Defendants Parfenchuck and Oetting were
thus inclined to continue and/or increase their referrals to
Defendant Wood.   (Id.)   Defendants Parfenchuck and Oetting
accounted for nearly all the surgeries performed at University
Hospital during the relevant period that used spinal equipment and
devices supplied by Defendant Wood's entities, and Defendant Wood
even noted that other physicians did not use his products.  (Id.
at 19.}  Thus, the profit distributions to Defendant Augusta Spinal
were based on referrals by Defendants Parfenchuck and Oetting.
(Id. at 19-20.)  This POD kickback scheme continued until at least

2020. (Id. at 17.)  This arrangement presented a dangerous profit motive for Defendants Parfenchuck and Oetting in exercising their medical judgment.  (Id. at 20.)

UHS was aware and, tacitly or explicitly, approved of the arrangement between Defendant Wood, his entities, and Defendants Parfenchuck and Oetting.  (Id.)  UHS had a strong financial motive to avoid interfering with Defendants Parfenchuck and Oetting because of the enormous volume of surgeries they performed, from which UHS derived significant profits.  (Id.)  Throughout the kickback scheme, Defendants Parfenchuck and Oetting performed hundreds, or even thousands, of surgeries at University Hospital using spinal devices and equipment distributed by Defendant Wood's entities.  (Id. at 21.)  As a result, UHS paid tens of millions of dollars to Defendant Wood's entities, which then distributed millions of dollars in kickbacks to Defendants Parfenchuck and Oetting through payments to Defendant Augusta Spinal.  (Id. at 21-23.)  A substantial portion of the surgeries and procedures performed at University Hospital by Defendants Parfenchuck and Oetting using the spinal equipment and devices supplied by Defendant Wood's entities were for patients covered by Medicare, Georgia Medicaid, and other federally funded programs, which collectively paid over ten million dollars in claims for spinal equipment and devices supplied by Defendant Wood's entities.  (Id.

at 23-26.)  Based on this conduct, Relators assert claims against Defendant for violation of the FCA.  (Id. at 26-28.)

## II. LEGAL STANDARD

In considering a motion to dismiss under Rule 12(b)(6), the Court tests the legal sufficiency of the complaint.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).  Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of both the claim and the supporting grounds.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Although "detailed factual allegations" are not required, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555).

A plaintiff's pleading obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).  The Court need not accept the pleading's legal conclusions as true, only its well-pleaded facts.  Id. at 677-79.  Furthermore, "the court may dismiss a complaint pursuant to [Rule 12(b)(6)] when, on the basis of a dispositive

issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) (citing Exec. 100, Inc. v. Martin Cnty., 922 F.2d 1536, 1539 (11th Cir. 1991)).

Furthermore, FCA claims are governed by Rule 9(b)'s heightened pleading standard, which requires "particularity" concerning the circumstances constituting fraud. Fed. R. Civ. P. 9(b); United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1308-09 (11th Cir. 2002). To satisfy Rule 9(b), a complaint must allege with particularity "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." United States ex rel. Matheny v. Medco Health Sols., Inc., 671 F.3d 1217, 1222 (11th Cir. 2012) (internal quotation marks and citation omitted). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).

## III. DISCUSSION

Relators assert three causes of action against all Defendants: (1) presenting false claims in violation of 31 U.S.C. § 3729(a)(1)(A); (2) making or using false records or statements material to payment or approval of false claims in violation of 31

U.S.C. § 3729(a)(1)(B); and (3) conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C).   (Doc. 173, at 26-28.) "The [FCA] is the primary law on which the federal government relies to recover losses caused by fraud."   McNutt ex rel. United States v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005) (citation omitted).

> [The FCA] permits private persons to file a form of civil action (known as *qui tam*) against, and recover damages on behalf of the United States from, any person who . . . "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval . . . [or] knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

Clausen, 290 F.3d at 1307 (quoting 31 U.S.C. § 3729(a)(1)-(2)). For his services, the relator is entitled to a substantial percentage of the recovery.   31 U.S.C. § 3730(d).

"Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." Corsello, 428 F.3d at 1012 (citation omitted).  In the healthcare context, a violation often occurs when a person or entity "bill[s] for services not provided or not medically necessary" or "falsely certifies that it is in compliance with federal health care laws that are a condition of payment."   United States ex rel. Chase v. HPC Healthcare, Inc., 723 F. App'x 783, 788 (11th Cir. 2018) (citations omitted).  Here, there are no allegations Defendants

10

provided unnecessary medical services.  (See Doc. 173.)  Rather, Relators' claims are predicated on Defendants allegedly not complying with federal health care law because they violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS").  (Id. at 7-9, 12-23.)  Noncompliance with the AKS bars the receipt of Medicare payments, and thus a violation of the AKS can form the basis of liability under the FCA for past Medicare payments attributable to the violations. Bingham v. HCA, Inc., 783 F. App'x 868, 871 (11th Cir. 2019) (citation omitted).

Because violation of the AKS is necessary for Relators to establish violation of the FCA for their claims, the Court first turns to whether Relators sufficiently pled violation of the AKS, then analyzes Relators' pleadings concerning violations of the FCA.

## A. AKS Violation

The AKS "broadly forbids kickbacks, bribes, and rebates in the administration of government healthcare programs." Carrel v. AIDS Healthcare Found., Inc., 898 F.3d 1267, 1272 (11th Cir. 2018) (citing 42 U.S.C. § 1320a-7b(b)).  In relevant part, it provides:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony.

11

42 U.S.C. § 1320a-7b(b)(2)(A).   Put simply, a violation of AKS occurs when the defendant (1) knowingly and willfully; (2) offered, paid, solicited, or received remuneration; (3) to induce a person (e.g., a doctor) to refer an individual for the furnishing of medical services or items; (4) which may be paid for by federal funds (e.g., Medicare). Id.; see also United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 698 (11th Cir. 2014) (citation omitted).   Violations of the AKS, like the FCA, must be pled with particularity under Rule 9. Mastej, 591 F. App'x at 705.

The Moving Defendants contend Relators failed to sufficiently plead the elements of an AKS violation. (Doc. 175, at 7; Doc. 176, at 9-14.)   The Augusta Spinal Defendants argue Relators do not sufficiently allege remuneration under the AKS resulted from the consulting agreements. (Doc. 175, at 7.)   UHS contends Relators not only failed to provide adequate information to determine whether the alleged kickback incentives constituted remuneration but also failed to sufficiently allege UHS knowingly and willfully induced conduct violating the AKS. (Doc. 176, at 9-13.)   Relators contend they adequately alleged an underlying AKS claim. (Doc. 179, at 11-15.)

Turning first to remuneration, as outlined above "[a]n AKS violation . . . requires that there be 'remuneration' offered or

12

paid in the transaction at issue." Bingham, 783 F. App'x at 873. "Remuneration," however, is not specifically defined by statute. See 42 U.S.C. § 1320a-7b(b). To determine the meaning of remuneration, the Eleventh Circuit relies on the ordinary meaning, common usage, and other related statutory definitions of the word. Bingham, 783 F. App'x at 873. Based on this, "remuneration" is payment or compensation, meaning the conferment of a benefit, the value of which is quantified by reference to fair market value. Id. Thus, a relator must address fair market value to show a defendant offered or received renumeration in violation of the AKS. Id.

The Court finds Relators did not sufficiently allege that any payment, characterized as either a consulting fee or distribution, made to Defendants Parfenchuck or Oetting was above fair market value for the services provided under the agreements. While Relators allege in detail the payments made to Defendants Parfenchuck or Oetting under these agreements, nowhere do they allege the value of Defendants Parfenchuck or Oetting's services in reference to the fair market value of such services. (Doc. 173, at 10-21.) Rather, Relators conclusory allege the services offered under the agreements were illegitimate, or at best *de minimis*, so such services did not justify the payments made. (Id. at 14-20.) As a result, Relators conclude the "fair value" was "well below" what Defendants Parfenchuck and Oetting were

compensated. (Id. at 17.) In response to the Moving Parties'
arguments related to fair market value of the services provided
under the agreements, Relators assert for the first time that
Defendants Parfenchuck and Oetting's services under the agreements
are worth $0 because they were not entitled to any compensation.
(Doc. 179, at 13.) However, Relators allege Defendant Parfenchuck
did provide services to Defendant Wood, including "controlling
inventory, making sure product lines get stocked, evaluating
products, and seeing what works and what didn't work." (Doc. 173,
at 16 (alterations adopted).) Even though Relators disagree about
the value of these services, whether these services complied with
the agreements, and the propriety of the agreements, to state,
without reference to any fair market comparison, that the services
are completely worthless is insufficient to satisfy Rule 9(b)'s
pleading requirement. United States ex rel. Johnson v. Bethany
Hospice & Palliative Care, LLC, No. CV416-290, 2020 WL 1542339, at
*7 (S.D. Ga. Mar. 31, 2020), aff'd sub nom. Est. of Helmly v.
Bethany Hospice & Palliative Care of Coastal Ga., LLC, 853 F. App'x
496 (11th Cir. 2021) ("[W]ithout alleging a benchmark of fair
market value, it is impossible for the Court to infer whether [the
defendant's] offer falls sufficiently below the benchmark so as to
constitute remuneration." (internal quotation marks and citations
omitted)). Even if Relators' allegation that the services were
worth $0 was sufficient to plead a fair market value comparison,

14

this allegation was made for the first time in response to the Moving Parties' motions to dismiss. (Doc. 179, at 13.) Parties may not amend their pleading by reply brief, so this new allegation is not properly before the Court. See Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 959 (11th Cir. 2009).[2]

Turning to whether Relators sufficiently alleged UHS knowingly and willfully induced the alleged conduct violating the AKS, the Court finds Relators' pleadings also fall short of Rule 9's particularity requirement. Relators allege:

> While the above-described scheme(s) were ongoing, [UHS] was aware of, and tacitly or explicitly approved of the arrangements between Wood (and/or his entities) and Drs. Parfenchuck and Oetting. Indeed, UHS had a strong financial motive to refrain from ruffling any feathers with Drs. Parfenchuck and/or Oetting, as they both regularly performed an enormous volume of surgeries at University Hospital — referrals from which UHS itself was deriving significant profits. Additionally, while hospitals overwhelmingly have policies requiring surgeons to execute periodic certifications confirming that they are not subject to any conflicts of interest — specifically including any financial arrangements with entities that supply medical devices or equipment to the particular hospital — University Hospital did not produce any requested policies or certifications in response to an HHS-OIG subpoena.

---

[2] Relators also assert for the first time in response to the motions to dismiss that the alleged kickbacks resulted in an increase in the cost of devices to the hospital. (Doc. 179, at 9, 17-18 ("When Doctors performed a spinal surgery on a Medicare/Medicaid beneficiary using Wood's spinal devices and equipment, the 67% of net profits received in the form of kickbacks converted to an impermissibly higher DRG bundled rate in the next year.")). It is not clear what arguments this allegation pertains to, but again this allegation is not properly before the Court as a party may not amend by reply brief. Wilchombe, 555 F.3d at 959. The Court therefore does not consider this allegation, or Relators' arguments related to it.

(Doc. 173, at 20 (emphasis omitted).)   Relators provide great detail about the Augusta Spinal Defendants' active involvement in the allegedly improper kickback schemes, but there are no allegations other than the one above as to UHS's "knowing" and "willful" inducement of the schemes alleged to violate the AKS. (See id.)  While knowledge may be alleged generally, Relators must still state with particularity *who* had the requisite knowledge and intent related to the scheme at UHS and details of its acts.   See Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1051 (11th Cir. 2015).  Relators' broad allegation of UHS's general awareness and "tacit or explicit" approvement of the underlying kickback scheme lacks the particularity required to meet Rule 9's heightened pleading requirement as it does not provide "details of [UHS's] allegedly fraudulent acts, when they occurred, and *who* engaged in them."  (Doc. 173, at 20); Matheny, 671 F.3d at 1222 (emphasis added and citations omitted).  For these reasons, the Court finds Relators failed to sufficiently plead the existence of an underlying AKS violation.

## B. FCA Violations

Even if Relators sufficiently alleged Defendants violated the AKS, the Court finds they have not sufficiently alleged facts supporting any of their FCA claims.  The Court addresses each claim below.

1. <u>Presentment and False-Statement Claims</u>

An essential element of both a presentment claim and false-statement claim is submission of a false claim, which was either presented to, made to, or paid by the federal government.  <u>United States ex rel. 84Partners, LLC v. Nuflo, Inc.</u>, 79 F.4th 1353, 1359 (11th Cir. 2023) (citation omitted); <u>see also</u> <u>Carrel</u>, 898 F.3d at 1275; <u>Clausen</u>, 290 F.3d at 1311.   The Eleventh Circuit labeled submission of a claim "the *sine qua non* of a[n] [FCA] violation." <u>Clausen</u>, 290 F.3d at 1311.  Indeed, "[s]tanding alone, a fraudulent scheme, no matter how egregious, is not enough; there must be an actual false claim."   <u>84Partners, LLC</u>, 79 F.4th at 1360.   Rule 9(b) "requires the false claim and, at least for § 3729(a)(1)(A), its presentment to be alleged with particularity." <u>Id.</u> (citation omitted).

The Moving Defendants argue Relators failed to sufficiently allege a false claim and its presentment with particularity.  (Doc. 175, at 7–8; Doc. 176, at 13, 15–18.)  Relators rely on an implant log, which provides a record of Defendants Parfenchuck and Oetting's surgeries and procedures from 2012 through early-2020 including the devices and equipment used and the coverage provider for the patient, to demonstrate federally funded health care programs paid over ten million dollars in claims for equipment and

devices supplied in violation of the AKS.[3]  (Doc. 173, at 24-25.)
In response to the motions to dismiss, Relators argue the log
"provides the universe of [Defendants Parfenchuck and Oetting's]
surgeries at [UHS] resulting from kickbacks" because it provides:

> (1) the date of surgery; (2) patient name and unique
> medical record number; (3) surgeon; (4) all procedures
> performed by the surgeon; (5) manufacturer of spinal
> device and equipment; (6) name, cost per unit, and
> quantity of spinal device or equipment used; (7) primary
> and secondary insurer; and (8) whether the device was
> implanted or wasted.

(Doc. 179, at 16-17, 19.)  Thus, according to Relators, the log
provides precise billing data to sufficiently plead a false claim
and its submission and presentment under Rule 9.  (Id. at 16-18.)
In reply, the Moving Defendants contend this log is insufficient
to show any false claims were actually submitted to a federally
funded health care program.  (Doc. 180, at 8-9; Doc. 181, at 8-
11.)

In the Eleventh Circuit, a relator can meet Rule 9's
heightened pleading standard to show submission of a false claim
using one of two approaches.  Chase, 723 F. App'x at 789.  The
first is to reference "specific billing information – such as
dates, times, and amounts of actual false claims or copies of
bills" submitted to the government.  Id. at 789 (citations

---

[3] Relators incorporate by reference the entire excel file containing the implant
logs as Exhibit 11.  (Doc. 173, at 23 n.2.)  But the excel file has not been
provided to the Court.  (See Doc. 174-1, at 97-98.)  So, the Court relies only
on the excerpts of the implant logs Relators inserted into the Complaint.  (See
Doc. 173, at 24-25.)

omitted); see, e.g., Matheny, 671 F.3d at 1226 (finding particularized allegations of fraud where the complaint identified the "patient or account number, the Medicare or Medicaid claim invoice number or reimbursement check number, the line item number of the invoice, the carrier, fiscal intermediary or insurance company code, the amount of [o]verpayment, and how long the [o]verpayment remained in each patient account"). However, relators cannot describe an illegal kickback scheme in detail and then state claims "must have been submitted, were likely submitted, or should have been submitted." Carrel, 898 F.3d at 1275 (alteration adopted and citation omitted).

The second is to allege "direct knowledge of the defendants' submission of false claims based on [the relators'] own experiences and on information [they] learned in the course of [their] employment." Chase, 723 F. App'x at 789 (citation omitted); see, e.g., United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc., 433 F.3d 1349, 1360 (11th Cir. 2005) (declining to dismiss where the relator, a former nurse practitioner with the defendant, allegedly billed her services under a physician's name each day and was told by the office administrator that all nurse practitioners and physician assistants billed in this manner); Hill v. Morehouse Med. Assocs., Inc., No. 02-14429, 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003) (holding that the relator's allegations were reliable since she worked in the

19

defendant's billing department and observed employees and physicians alter billing codes and submit false claims for Medicare reimbursement). Even when relators profess insider knowledge of a defendants' billing practices and patient records, they are not spared from the requirement of alleging a specific factual basis for false claims. See Carrel, 898 F.3d at 1276 (citation omitted).

In Carrel, the relators likewise argued submission of false claims based on an underlying unlawful kickback scheme. Id. at 1270. The relators relied, in part, on a spreadsheet created by the defendant "that list[ed] hundreds of patients, employees, test dates, and potential sources of insurance coverage, including federal healthcare programs." Id. Based on this spreadsheet, the relators concluded that because public funds accounted for almost half of the defendant's revenue, the defendant must have submitted false claims. Id. The Eleventh Circuit, in affirming dismissal of the relator's FCA action for failure to plead with particularity, explained the spreadsheet was unpersuasive because the document merely identified *possible* sources of funding. Id. at 1278. It found the spreadsheet was not "a billing form nor a record of actual reimbursements" and it "[did] not memorialize any actual claims [the defendant] submitted to government programs for services provided to illegally referred patients." Id. at 1278. Thus, it was not "specific billing information" that could provide "indicia of reliability" that a false claim was submitted to the

government.  Id. at 1277 (citation omitted); Chase, 723 F. App'x
at 789 (citations omitted); Matheny, 671 F.3d at 1227.

Here, the implant log alone is similarly unpersuasive.  While
it provides information on the date, time, services, coverage
provider, and patient information, it is missing a key component
– the amount of the false claim submitted to the coverage provider.
(Doc. 173, at 24-25.)  The implant log provides the cost of the
devices used, but this does not demonstrate this was the amount of
a false claim actually submitted or that a false claim was ever
submitted.  (Id.)  Moreover, the Moving Defendants argue UHS's
billing procedures result in federally funded programs being
charged a flat scheduled fee, which reimburses itemized charges
for devices or equipment.[4]  (Doc. 175, at 11-12; Doc. 176, at 17;
Doc. 180, at 9.)  This alleged billing structure further dilutes
any inference the implant log represents the specific amounts of
false claims.  While Relators need not submit exact billing data
to carry their burden under Rule 9, "submission . . . [can]not

---

[4] The Parties spend considerable time discussing the billing process for
federally funded services which utilized the "tainted devices."  (See Docs.
175, 176, 180.)  According to the Parties, the government pays under a diagnosis-
related group ("DRG") structure regardless of how procedural equipment is
acquired.  (Doc. 175, at 11-12; Doc. 176, at 17; Doc. 180, at 9.)  The Augusta
Spinal Defendants argue this billing structure means Relators "must . . .
demonstrate the government paid for unnecessary surgeries, not screws and rods."
(Doc. 175, at 12.)  The Court disagrees.  As explained above, the submission of
a claim tainted by kickbacks can form the basis of a FCA claim, even if the
procedure was necessary.  See Bingham, 783 F. App'x at 871.  Because none of
this information about government payment is contained in the Complaint (see
Doc. 173), the Court declines to address the allegations concerning the DRG
billing structure, other than to clarify this misunderstanding of applicable
law.

[be] inferred from the circumstances." Mastej, 591 F. App'x at 704 (citations omitted); Corsello, 428 F.3d at 1013 (citation omitted). Like the spreadsheet in Carrel, the implant log provides nothing more than an inference that false claims may have been submitted to the government. The Court therefore finds Relators did not sufficiently plead "specific billing information" with particularity to succeed under the first route. Chase, 723 F. App'x at 789 (citations omitted); see, e.g., Matheny, 671 F.3d at 1227.

Turning to the second route, the Court finds Relators did not sufficiently allege they possessed "direct knowledge of the defendants' submission of false claims based on [their] own experiences and on information [they] learned in the course of [their] employment." Chase, 723 F. App'x at 789 (citation omitted). The Eleventh Circuit is "more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." Matheny, 671 F.3d at 1230 (citation omitted). "[A] relator's firsthand knowledge of a defendant's actual submission of false claims may, where supported by appropriate factual allegations, provide 'sufficient indicia of reliability' to substitute for the particularized allegations that Rule 9(b) generally requires." United States ex rel. Aquino v.

Univ. of Mia., 250 F. Supp. 3d 1319, 1332 (S.D. Fla. 2017) (citing Mastej, 591 F. App'x at 704).

Relators allege "[n]on-public information personally known to [them] serves as the basis of this action." (Doc. 173, at 4.) The Augusta Spinal Defendants contend Relators have no knowledge of the dealings underlying this claim, so they are not entitled to leniency in analyzing whether they stated their claim with the requisite particularity. (Doc. 175, at 9.)   UHS contends Mr. Switzer is not an "original source" of the allegations and Ms. Switzer has not alleged to have any involvement or original source knowledge of the alleged schemes. (Doc. 176, at 5.)   In response, Relators do not argue they have firsthand knowledge such that they are entitled to more leniency but raise the issue only in their request for leave to amend. (Doc. 179, at 20-21.)

Relators' pleadings are insufficient to show they have the type of personal, firsthand knowledge that would overcome the gaps in particularity with which they have alleged the submission of a false claim. First, based on the complaint, Mr. Switzer ceased doing business with Defendant Wood before the underlying kickback schemes ever came to fruition, so his business dealings with Defendant Wood would not have provided him with personal, firsthand knowledge of defendant's actual submission of false claims. (Doc. 173, at 13.)   Second, there are no allegations of Ms. Switzer's direct or personal knowledge of the business dealings of

23

Defendants. (See id.) Thus, the Court finds Relators do not meet the "relatively high bar for 'indicia of reliability'" established by the Eleventh Circuit. Aquino, 250 F. Supp. 3d at 1332. Specifically, Relators "cannot rely on their 'personal knowledge or participation' in the alleged fraud" to provide sufficient indicia of reliability because they did not sufficiently allege the type of involvement that would give them such knowledge. Carrel, 898 F.3d at 1277 (citing Matheny, 671 F.3d at 1230). Accordingly, the Court finds Relators failed to plead their allegations that Defendants submitted false claims to the government for reimbursement with the particularity required by Rule 9(b).

### 3. Conspiracy Claim

The Court finds Relators' allegation that Defendants conspired to defraud the government in violation of section 3729(a)(3) of the FCA likewise fails to satisfy the requirements of Rule 9(b). Section 3729(a)(1)(c) "of the [FCA] imposes liability on those who 'conspire[ ] to defraud the government by getting a false or fraudulent claim allowed or paid.'" Corsello, 428 F.3d at 1014 (quoting 31 U.S.C. §3729(a)(1)(c)'s predecessor 31 U.S.C. § 3729(a)(3)). To state a claim under section 3729(a)(1)(c), the plaintiff must show "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the

24

conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." Id. (citation omitted).

The Moving Defendants contend Relators' conspiracy claim should be dismissed because it fails to plead with requisite particularity the conduct forming the basis of the conspiracy claim or allege submission of a fraudulent claim causing damages to the United States. (Doc. 175, at 13-14; Doc. 176, at 19-20.) Relators argue the Augusta Spinal Defendants' active participation in the underlying kickback scheme and the increased referrals of federally funded beneficiaries to Defendant Wood is sufficient to plead a claim for conspiracy under the FCA. (Doc. 179, at 19-20.)

As to the first and second elements of a conspiracy claim, the Court finds Relators failed to sufficiently allege the Moving Defendants conspired or performed an overt act in furtherance of the conspiracy. See Corsello, 428 F.3d at 1014 (citation omitted). While Relators allege "Defendants performed acts, including entering into sham consulting agreements and/or PODs or POD-type arrangements, and the payment or receipt of kickbacks, to effect the object of the conspiracy," the only Defendants alleged to have entered these agreements are the Augusta Spinal Defendants and Defendant Wood and his entities. (Doc. 173, at 14-20.) There is no allegation UHS was also a part of these agreements. (See id.) Indeed, Relators' response to the motions to dismiss does not even

address UHS's culpability but focuses solely on the Augusta Spinal Defendants' conduct. (Doc. 179, at 19-20.) Thus, Relators failed to sufficiently allege UHS committed an overt act in furtherance of the conspiracy. See Corsello, 428 F.3d at 1014 (citation omitted).

As to the Augusta Spinal Defendants, the Court finds Relators failed to allege an agreement to violate the FCA. See id. (citation omitted). Relators allege "Defendants conspired with each other to commit the violations alleged . . ., including" presenting a false claim and making false statements material to a false claim in violation of the FCA. (Doc. 173, at 28.) The Complaint, however, fails to identify who conspired with whom or "any specific facts that show an agreement to violate the [FCA]." Chase, 723 F. App'x at 791. Relators argue the increase in referral of federally funded beneficiaries is sufficient to plead an agreement between the Augusta Spinal Defendants and Defendant Wood to violate the FCA. (Doc. 179, at 20.) But without specific factual allegations that these Defendants entered an agreement to violate the FCA, Relators fall short of stating a conspiracy claim. Chase, 723 F. App'x at 791.

As to the third element, the Court finds Relators failed to allege the United States suffered damages as a result of either UHS or Augusta Spinal Defendants' false claims. See Corsello, 428 F.3d at 1014 (citation omitted). Relators allege "[t]he conduct

26

of Defendants violated 31 U.S.C. § 3729(a)(1)(C) and was a substantial factor in causing the United States to sustain damages in the amount according to proof." (Doc. 173, at 28.) It is not clear what Relators mean by "according to proof," but as they rely heavily on the implant log to argue the amount of funds the United States paid for tainted devices, the Court reiterates the implant log is insufficient to allege the United States was billed such "damages." (See id. at 21, 23-26.) As explained above, Relators failed to allege submission of a false claim with particularity based on the implant log. Without sufficient allegations of a false claim, Relators failed to show "the United States suffered damages as a result of the false or fraudulent claim." Corsello, 428 F.3d at 1014 (citation omitted). For these reasons, the Court finds Relators failed to sufficiently allege their conspiracy claim with particularity as required by Rule 9(b).

## C. Request to Amend

Relators request leave to amend their complaint should the Court find it deficient. (Doc. 179, at 20-22.) Relators state they can plead additional facts related to an email from UHS's business manager about Defendant Wood's request for price increases for his devices and equipment, deposition testimony from a previous case, and Ms. Switzer's independent knowledge of the Augusta Spinal Defendants' business operations. (Id.) The Moving Defendants argue the Court should deny Relators' request because

any further amendment to the complaint would be futile. (Doc. 176, at 20-21; Doc. 180, at 9-13; Doc. 181, at 13-14.) The Moving Defendants point out Relators amended their complaint once and they were already on notice of the pleading's deficiencies by virtue of the Moving Defendants' original motions to dismiss filed in the United States District Court for the Central District of California. (Doc. 180, at 12; Doc. 181, at 14.)

The Court does not agree that allowing a second amended complaint would be futile. Neither this Court nor the Central District of California has made a ruling regarding the adequacy of Relators' pleadings under Rule 9. The Eleventh Circuit has recognized in the Rule 9 pleading context, plaintiffs are entitled to one chance to amend their complaints to bring them into compliance with Rule 9.[5] Clausen, 290 F.3d at 1308 (citation omitted). Furthermore, Relators claim they can provide the specific details necessary to cure the complaint's deficiencies.

---

[5] In support of their request for leave to amend, Relators contend because the Central District of California did not address the Moving Defendants' 12(b)(6) arguments, they have not had the "benefit" of Court review of their complaints and opportunity to cure such deficiencies. (Doc. 179, at 21.) While the Moving Parties' 12(b)(6) arguments go hand-in-hand with their Rule 9 arguments, the Court clarifies the "one chance to amend" granted here pertains to Relators' failure to comply with Rule 9's particularity standard. The Relators are reminded "Rule 15's liberal amendment standard is not an unqualified license to fix every new defect as the court uncovers them." Evans v. Alston, No. CV 118-067, 2018 WL 4924549, at *1 (S.D. Ga. Oct. 10, 2018) (quoting In re Engle Cases, 767 F.3d 1082, 1123 (11th Cir. 2014)). The Court cautions Relators a second amended complaint will be subject to dismissal with prejudice if it does not state a cause of action, including, but not limited to, any failures to plead with requisite particularity.

(Doc. 179, at 20-22.)  For these reasons, Relators' request to amend is **GRANTED**.

Accordingly, Relators shall have **FOURTEEN (14) DAYS** from the date of this Order to file a second amended complaint.  Because the Complaint will no longer be the operative pleading, the Moving Defendants' motions to dismiss (Docs. 175, 176) are **DENIED AS MOOT.** Auto-Owners Ins. Co. v. Tabby Place Homeowners Ass'n, 637 F. Supp. 3d 1342, 1348 n.4 (S.D. Ga. 2022) (citations omitted).

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Moving Defendants' motions to dismiss (Docs. 175, 176) are **DENIED AS MOOT.**  Plaintiff is **DIRECTED** to file a second amended complaint within **FOURTEEN (14) DAYS** of the date of this Order in compliance with the Court's findings.

**ORDER ENTERED** at Augusta, Georgia, this ____ day of August, 2024.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA